UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.  Criminal Action No. 3:09mj433

MARLON K. CHRISTIE,

Defendant.

## MEMORANDUM OPINION

This matter came before the Court for trial on November 13, 2009. Defendant Christie is charged with driving under the influence of alcohol and speeding 72 miles per hour in a 45 mile per hour zone.

At trial, the United States moved to admit into evidence certificates verifying the accuracy of the tuning forks used to calibrate the radar that detected Christie's speed.[1] The United States also moved to admit into evidence a certificate printed by the EC/IR-II Intoxilyzer

---

[1] Exhibit 1 is a "Tuning Fork Certification of Accuracy" from Virginia Communications Traffic Safety Radar, Inc. It is signed and notarized by Jane M. Heymack. It certifies that on May 19, 2009, the tuning fork bearing serial number 30614 had been tested and found to oscillate at 2539 Hz at 23.3 degrees Celsius, and when used with a Kustom Signals traffic radar operating at 24.150 GHz, will cause a calibration signal of 35 miles per hour.

Exhibit 2 is a "Tuning Fork Certification of Accuracy" from Virginia Communications Traffic Safety Radar, Inc., signed and notarized by Ms. Heymack. It certifies that on May 19, 2009, the tuning fork bearing serial number 28880 had been tested and found to oscillate at 4726 Hz at 23.3 degrees Celsius, and when used with a Kustom Signals traffic radar operating at 24.150 GHz, will cause a calibration signal of 65 miles per hour. Neither certificate bears the certification of the custodian of records at the Military Provost's Office at Fort Lee, Virginia.

machine ("Intoxilyzer") used to determine Christie's blood alcohol level on August 23, 2009.[2] Christie objected to the admission of these three certificates.[3]

For the following reasons, the Court determines that the Intoxilyzer certificate stating Christie's blood alcohol concentration at the time of testing ("Certificate of Analysis") constitutes admissible evidence. The tuning fork certificates constitute inadmissible hearsay evidence. Because the Certificate of Analysis constitutes admissible evidence, the Court finds Christie GUILTY of Count One of the Criminal Information. The Court finds Christie NOT GUILTY of Count Two of the criminal information.

## I. Findings of Fact

On August 23, 2009, Officer Napper of the Fort Lee Provost Marshal's Office observed a blue 2001 Suburban traveling east on Route 36, adjacent to Fort Lee, Virginia, a place within the special territorial jurisdiction of the United States,[4] at a high rate of speed. (Nov. 13, 2009 Trial

---

[2] Exhibit 4 is a "Certificate of Blood Alcohol Analysis" from the Commonwealth of Virginia Department of Forensic Science. It bears the name of the Defendant, Marlon K. Christie; the name of the officer who conducted the test, Officer Ronald L. Napper; the date and time Officer Napper conducted the test; and the result of the test: an alcohol content of 0.12 grams per 210 liters of breath. The certificate also contains an attestation clause affirming that the test was conducted according to the methods approved by the Department of Forensic Science and that the equipment used to conduct the test had been tested within the past six months and found to be accurate.

[3] In post-trial briefing, Christie withdrew his objection to the admission of the tuning fork certificates. (Def.'s Post-Trial Br. 4.)

[4] Christie argues that testimony at trial failed to establish that Christie was traveling within the jurisdiction of the Eastern District of Virginia. (Def.'s Post-Trial Br. 4.) However, during Officer Napper's direct examination, the Court took judicial notice that Fort Lee falls within the special territorial jurisdiction of the United States. (Nov. 13, 2009 Trial Tr. 3:12-16.) Moreover, Officer Napper testified that he observed Christie driving at a high rate of speed along Route 36 eastbound, directly adjacent to Fort Lee. (Nov. 13, 2009 Trial Tr. 6:5-12.) Therefore,

2

Tr. 5:12-6:12.) Officer Napper confirmed by radar that the Suburban was traveling at a speed of 72 miles per hour in a 45 mile per hour zone. (Nov. 13, 2009 Trial Tr. 17:17-21.) Officer Napper turned his patrol vehicle, initiated his lights, and attempted to stop the vehicle. (Nov. 13, 2009 Trial Tr. 6:21-7:1.) The vehicle did not stop immediately. (Nov. 13, 2009 Trial Tr. 18:8-9.) When Officer Napper caught up to the vehicle, he initiated his siren. (Nov. 13, 2009 Trial Tr. 18:3-7.) The vehicle traveled into Hopewell and stopped near Tri-City Boulevard near the McDonald's and Shoney's. (Nov. 13, 2009 Trial Tr. 18:11-13.)

Officer Napper conducted a traffic stop and identified the driver of the vehicle as Marlon K. Christie. (Nov. 13, 2009 Trial Tr. 18:14-16.) Officer Napper observed that Christie's eyes were glassy and bloodshot. (Nov. 13, 2009 Trial Tr. 18:21-22.) Officer Napper requested Christie's driver's license, which Christie provided. (Nov. 13, 2009 Trial Tr. 19:2.) Officer Napper testified that Christie was "incoherent at times" because upon Officer Napper's request for his registration, Christie handed Officer Napper an insurance form instead of the registration for the vehicle, stating that the insurance form was the vehicle's registration. (Nov. 13, 2009 Trial Tr. 18:22-19:5.) Officer Napper testified that Christie then asked him if he had already given the officer his license and registration. (Nov. 13, 2009 Trial Tr. 19:6-8.) Officer Napper testified that this indicated to him that something was wrong with Christie. (Nov. 13, 2009 Trial Tr. 19:10-11.) During the course of his investigation, Officer Napper learned that the vehicle did not belong to Christie, but to Christie's brother. (Nov. 13, 2009 Trial Tr. 43:1-5.) Christie told

---

the Court determines that no jurisdictional issue exists, and the Court will not dismiss the charges on this ground.

Officer Napper, "I'm not sure where my brother keeps his registration." (Nov. 13, 2009 Trial Tr. 43:6-9.)

During the stop, Officer Napper smelled the strong odor of an unknown alcoholic beverage emitting from Christie's person and vehicle. (Nov. 13, 2009 Trial Tr. 19:12-13.) Officer Napper asked Christie to step out of the vehicle. (Nov. 13, 2009 Trial Tr. 19:14-16.)

Because he intended to administer to Christie three standard field sobriety tests,[5] prior to beginning the tests Officer Napper asked Christie if he was physically able to perform the tests. (Nov. 13, 2009 Trial Tr. 19:21-23.) Christie informed Officer Napper that he had pain behind his left knee, but that he would attempt to complete the tests. (Nov. 13, 2009 Trial Tr. 20:1-3.) The standard field sobriety tests consist of the horizontal gaze nystagmus ("HGN") test, the walk-and-turn test, and the one-leg stand test. (Nov. 13, 2009 Trial Tr. 24:15-18.)

Officer Napper first administered the HGN test. (Nov. 13, 2009 Trial Tr. 24:10-14.) Involuntary jerking of the eyes during this test indicates that the person has consumed alcohol. (Nov. 13, 2009 Trial Tr. 24:21-23.) Officer Napper testified that Christie exhibited six out of six clues on the HGN test. (Nov. 13, 2009 Trial Tr. 26:20-27:19.) Officer Napper next administered the walk-and-turn test to Christie. (Nov. 13, 2009 Trial Tr. 27:19-21.) Officer Napper testified that the walk-and-turn test has a total of eight clues, and that he observed three clues while Christie performed the test. (Nov. 13, 2009 Trial Tr. 28:23-29:6.) Christie missed heel-to-toe, stumbled on the turn, and raised his arms above 45 degrees to catch his balance. (Nov. 13, 2009

---

[5] At trial, Christie raised an objection to testimony regarding the standard field sobriety tests on the ground that the testimony did not meet the requirements of Rule 702. (*See* Nov. 13, 2009 Trial Tr. 20:6-23:6.) Christie later withdrew this objection. (Nov. 13, 2009 Trial Tr. 23:22-24.)

Trial Tr. 29:16-18.) Finally, Officer Napper administered the one-legged stand test. (Nov. 13, 2009 Trial Tr. 29:20-22.) Officer Napper did not observe any clues during this test. (Nov. 13, 2009 Trial Tr. 30:5-7.)

Based upon his observations, Officer Napper transported Christie back to the Provost Marshal's Office for a test of his blood alcohol concentration. (Nov. 13, 2009 Trial Tr. 30:19-31:1.) Officer Napper explained the implied consent form to Christie. (Nov. 13, 2009 Trial Tr. 31:2-5.) Christie indicated that he understood his rights under the implied consent. (Nov. 13, 2009 Trial Tr. 31:6-8.) Christie also stated to Officer Napper that he was not driving under the influence of alcohol, but rather, that he was driving while intoxicated. (Nov. 13, 2009 Trial Tr. 31:8-11.)

Officer Napper then tested Christie's blood alcohol concentration on the Intoxilyzer. (Nov. 13, 2009 Trial Tr. 32:16-22.) Officer Napper observed Christie for 20 minutes prior to administering the test to ensure that Christie had no alcohol residuals, and that Christie did not burp, regurgitate, or put anything into his mouth. (Nov. 13, 2009 Trial Tr. 33:1-3.) At the conclusion of the 20-minute period, Christie supplied Officer Napper with two samples of his breath. (Nov. 13, 2009 Trial Tr. 33:4-5.) The test resulted in a blood alcohol concentration reading of .12. (Nov. 13, 2009 Trial Tr. 36:14-15.)

The Intoxilyzer machine printed a Certificate of Analysis memorializing the results. (*See* Nov. 13, 2009 Trial Tr. 38:19-23 (identifying United States's Exhibit 4 as the certificate of blood alcohol analysis).) The Certificate of Analysis contains a statement verifying that the machine was tested for accuracy on June 3, 2009. (Nov. 13, 2009 Trial Tr. 40:17-22.) Officer Napper did not calibrate the machine himself, nor did he know who calibrated the machine. (Nov. 13, 2009

Trial Tr. 49:24-50:7.) Officer Napper testified that he serves as the custodian of the intoxilizer records. (Nov. 13, 2009 Trial Tr. 50:11-12.)

In addition to testimony regarding the factual circumstances of August 23, 2009, Officer Napper also provided testimony regarding his training in the operation of the Intoxilyzer. Officer Napper maintains a certification to operate the Intoxilyzer. (Nov. 13, 2009 Trial Tr. 34:12-23.) To administer the test, Officer Napper swiped his operator card, which input his information into the machine. (Nov. 13, 2009 Trial Tr. 35:3-7.) Officer Napper then entered Christie's information into the machine by swiping Christie's driver's license through the machine. (Nov. 13, 2009 Trial Tr. 39:22-40:1.) Officer Napper testified that the machine will not conduct the test and print a certificate without the testing officer's operator card. (Nov. 13, 2009 Trial Tr. 39:13-16.)

Officer Napper also testified regarding the calibration of his radar unit. The officer testified that his radar unit was operating properly on August 23, 2009. (Nov. 13, 2009 Trial Tr. 16:21-17:5.) Officer Napper testified that he tested the radar with 35 mile per hour and 65 mile per hour tuning forks both before and after his shift, and the radar was operating properly. (Nov. 13, 2009 Trial Tr. 8:8-13.) The tuning forks themselves are calibrated by a technician at the Provost Marshal's Office, but Officer Napper did not calibrate the tuning forks. (Nov. 13, 2009 Trial Tr. 10:3-18.) Officer Napper testified that the Provost Marshal's Office receives certificates verifying the calibration of the tuning forks. (Nov. 13, 2009 Trial Tr. 10:22-11:2.) The tuning fork certificates presented at trial were the certificates for X-Ray 70, the radar unit Officer Napper was operating on August 23, 2009. (Nov. 13, 2009 Trial Tr. 11:3-9,15:22-16:5.)

## II. Analysis

A.  **The Certificate Printed by the Intoxilyzer Machine Constitutes Admissible Evidence.**

Christie objects to the admission of the certificate printed by the Intoxilyzer machine as violative of the Confrontation Clause and the Supreme Court of the United States's decision in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), because the certificate "was obviously generated for use against Defendant Christie at trial" and serves as "a solemn declaration functionally identical to live, in-court, testimony, doing precisely what a witness does on direct examination." (Def.'s Post-Trial Br. 6.) Specifically, Christie asserts that "Officer Napper testified that he did not test the machine for accuracy nor was he present when the testing was done." (Def.'s Post-Trial Br. 8.) Thus, Christie argues, the testimony contained in the Certificate of Analysis "exceeds the scope of the personal knowledge of Officer Napper." (Def.'s Post-Trial Br. 8.) Christie asserts that this lack of personal knowledge requires the United States to produce "**both the operator of the breath machine and the person who tested the machine for accuracy.**" (Def.'s Post-Trial Br. 10.)

Christie's argument fails. This Court thrice has addressed the very issue Christie now presents. Evidence of routine testing for accuracy does not violate the Confrontation Clause. *See United States v. Griffin*, Criminal No. 3:09mj308, 2009 WL 3064757 (E.D. Va. Sept. 22, 2009); *United States v. Bacas*, Violation Nos. 1516466, 2117788, 2009 WL 3229370, at *2 (E.D. Va. Sept. 15, 2009); *see also United States v. Forstell*, Violation Nos. 1972831, 1972833, 2009 WL

2634666 (E.D. Va. Aug. 18, 2009), *aff'd*, Criminal Action No. 1:09cr437 (E.D. Va. Nov. 16, 2009). Christie propounds an argument contrary to this Court's established precedent.[6]

In *United States v. Bacas*, the Court considered whether certificates verifying the accuracy of the tuning forks used to calibrate radar equipment were testimonial in nature such that they violated the Confrontation Clause and the Supreme Court's decision in Melendez-Diaz. *See Bacas*, 2009 WL 3229370. In *Bacas*, the arresting officer testified live, subject to cross examination. *Id.* at *2. The technician who calibrated the tuning forks, however, did not appear in court. *Id.* This Court held that such routine testing information "offer[s] non-testimonial evidence falling outside the confines of the Confrontation Clause." *Id.* at *2.

Similarly, in *United States v. Griffin*, this Court considered a *Melendez-Diaz* challenge to the admissibility of a certificate of accuracy for a blood alcohol concentration test. *See Griffin*, 2009 WL 3064757. The challenged certificate of accuracy verified the proper operation of the Intoxilyzer. *See id.* at *1. The Court determined that the certificate of accuracy constituted "nontestimonial evidence beyond the scope and reach of the Confrontation Clause" because it "only convey[ed] information regarding the calibration and proper operation of the Intox EC/IR II." *Id.* at *2. The Court found that the Supreme Court's decision in *Melendez-Diaz* did not require the United States to produce a witness to testify to the accuracy of the calibration, and that "the Certificate of Accuracy was not prepared with knowledge of any particular defendant's case, or specifically for use in any particular trial." *Id.* The Court therefore determined that the

---

[6] In briefing, Christie cites only the Virginia Court of Appeals decision *United States v. Grant*, 682 S.E.2d 84 (Va. Ct. App. 2009), in support of his claim. (*See* Def.'s Post-Trial Br. 10.) The Court described the unpersuasive nature of that argument in its *Bacas* decision. *Bacas*, 2009 WL 3229370, at *2.

United States was not required to produce for trial the technician responsible for calibrating the equipment, and the certificate of accuracy was admissible. *Id.* at *3.

The Alexandria Division of this Court recently cited *Bacas* and *Griffin* with approval. *See Forstell*, 2009 WL 2634666, *aff'd*, Criminal Action No. 1:09cr437 (E.D. Va. Nov. 16, 2009). In *Forstell*, the Court affirmed the magistrate judge's determination that the admission of certificates verifying the accuracy of the radar device and the admission of a breath test certificate did not violate the defendant's Confrontation Clause rights. The Court noted that "Magistrate Judge Buchanan also properly found that the 'Breath Results Report falls well short of violative 'testimonial' evidence, even under an expansive reading of *Melendez-Diaz*. The Intoxilyzer's printout is non-testimonial . . . and the portions of the Report containing [the officer's] statements are no affront to Forstell's Confrontation Clause rights, as [the officer] testified at trial and was available for cross-examination on the subject." Criminal Action No. 1:09cr437, at 2.

In this case, the portion of the certificate Christie seeks to challenge falls squarely within the category of nontestimonial records carved out by the Supreme Court in *Melendez-Diaz* and previously recognized by this Court. *See Melendez-Diaz*, 129 S. Ct. at 2532 n.1; *Griffin*, 2009 WL 3064757; *Bacas*, 2009 WL 3229370, at *2; *Forstell*, 2009 WL 2634666. Moreover, the officer who operated the Intoxilyzer testified live and was subject to cross examination. Therefore, the admission of the Certificate of Analysis does not violate Christie's Confrontation Clause rights. The Court will OVERRULE Christie's objection and admit the Certificate of Analysis.

Because the Court has determined that the certificate of breath analysis is admissible, the Court has before it sufficient evidence to make a finding of guilt. Therefore, the Court finds

9

Christie GUILTY beyond a reasonable doubt of Count One of the Criminal Information, which charges Christie with driving with a blood alcohol concentration of greater than .08, but less than .15, grams per 210 liters of breath, to wit: .12.

### B. Uncertified Copies of Tuning Fork Certificates Are Inadmissible Evidence to Verify the Accuracy of the Tuning Forks Used to Confirm the Proper Operation of the Radar Device.

As the Court noted in *Bacas*, certificates verifying the accuracy of equipment or its regular maintenance may be non-testimonial, but they must still meet all requirements of the Federal Rules of Evidence to be admitted. *See Bacas*, 2009 WL 3229370, at *3-4. As was the case in *Bacas*, Exhibits 1 and 2 fail to meet the requirements of Rule 803(6) of the Federal Rules of Evidence because the custodian of the records did not certify them or introduce them via live testimony, and the United States failed to introduce them through the testimony of an "otherwise qualified witness." Therefore, Exhibits 1 and 2 constitute inadmissible hearsay evidence.

Rule 803(6)[7] of the Federal Rules of Evidence excepts from the hearsay rule records kept in the course of a regularly conducted business activity, if it is within the regular practice of that

---

[7] Fed. R. Evid. 803 states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . .
>
> (6) Records of Regularly Conducted Activity. - A memorandum, report, record, or data compilation, . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . .

Fed. R. Evid. 803(6).

business activity to keep such records. Fed. R. Evid. 803(6). To lay the foundation for the admissibility of such evidence, the records' proponent must establish that the records: (1) were made contemporaneously with the act; (2) by a person with knowledge; (3) in the regular course of business; and, (4) that it was the regular practice of the business to keep such records. *Id.*

Either "the custodian or other qualified witness" may lay the foundation for the records' admission. *Id.*; *see United States v. Sofidiya*, No. 97-4681, 1998 WL 743597, at *3 (4th Cir. Oct. 23, 1998). In the instant case, counsel for the United States informed the Court that Officer Napper does not serve as the custodian of records. (Nov. 13, 2009 Trial Tr. 13:13-15 ("[H]e is not the one who keeps the record. These are simply records kept in the provost marshal's office.").) Because they lack certification, and because the custodian of the records did not testify at trial, Exhibits 1 and 2 therefore must be introduced through the testimony of an "otherwise qualified witness."

Officer Napper's testimony fails to establish him as an "otherwise qualified witness" under Rule 803(6). Courts interpret the term "qualified witness" broadly, requiring only someone familiar with the creation and maintenance of the records. *Sofidiya*, 1998 WL 743597, at *3; *United States v. Hernandez*, Nos. 98-4378, 98-4388, 1998 WL 841504, at *3 (4th Cir. Dec. 7, 1998); *Rambus*, 348 F. Supp. 2d at 702-03. An "otherwise qualified witness" may lay the foundation for records' introduction despite lacking personal knowledge of the preparation of the records, but he or she must be familiar with the creation and record keeping procedures of the organization in order to establish the records' trustworthiness. *United States v. Jenkins*, 345 F.3d 928, 935-36 (6th Cir. 2003) (*citing Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 575-76 (6th Cir. 1999)); *Hernandez*, 1998 WL 841504, at *2; *United States v. Porter*, 821 F.2d 968, 977 (4th

Cir. 1987) (finding that a security guard who merely had access to company files but did not know how the records were created or the record keeping requirements of the company was not a custodian or an "otherwise qualified witness").

The United States failed to lay the foundation sufficient to render Officer Napper an "otherwise qualified witness." Officer Napper offered only generalized testimony regarding the tuning fork certificates. Officer Napper testified that he does not conduct the calibration of the tuning forks, but that the tuning forks are calibrated by a technician. (Nov. 13, 2009 Trial Tr. 10: 3-18.) Officer Napper offered no other testimony regarding the creation or maintenance of these certificates. He did not testify, as required by Rule 803(6), that the agency created the certificates contemporaneously with testing. Nor did he testify that the certificates were made by a person with knowledge at the time of testing, which Rule 803(6) also requires. Such generalized testimony does not establish that Officer Napper is familiar with the military police force's creation and maintenance of the certificates. *See In re Denslow*, 104 B.R. 761, 764-65 (E.D. Va. 1989) (holding that copies of computer-generated ATM statements were admissible under 803(6) because bank employees were persons with knowledge, the documents were prepared contemporaneously with the actions, and the bank relied on the records in the regular course of business). Therefore, because the United States failed to lay a proper foundation for the admission of Exhibits 1 and 2, this evidence will be excluded.

Because this evidence will be excluded, the Court therefore finds Christie NOT GUILTY on Count Two of the Criminal Information, which charges him with exceeding the posted speed limit by traveling 72 miles per hour in a 45 mile per hour zone.

### III. Conclusion

For the foregoing reasons, the Court finds the Defendant GUILTY on Count One, operating a motor vehicle with a blood alcohol concentration of .12. The Court finds the Defendant NOT GUILTY on Count Two, exceeding the posted speed limit.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: 12/3/09

13